[Civ. No. 445.   Fourth Appellate District.—September 26, 1930.]

COLEMAN M. GRAY, Appellant, v. HUGH MAGEE et al., Respondents.

George H. Stone for Appellant.

Estudillo & Schwinn and A. M. Thompson for Respondents.

BARNARD, J.—Victoria P. de Magee died intestate in 1886 and left as part of her estate certain lands in San Diego County which lie on the southwesterly slope of the Agua Tibia Mountain, in an elevated valley or bench bordered on all sides, except the southwest, by rapidly rising

ground. Hugh Magee, as one of the executors of this estate, has been in personal charge of these lands since about 1913. He has also entered under the law of the United States as cattle-raising homesteads, certain other adjoining tracts of land on the east, the north and the southwest. Portions of these other lands have been patented and other portions merely entered. For many years water had been diverted by the Magee family from Castro Creek, a natural stream running through the property, for the purpose of irrigating parts of said land. In 1924 plaintiff Gray established a camp on certain lands belonging to Hugh Magee under some arrangement with him. In 1925 he built thereon a stone lodge and certain other structures, and began to take a portion of the Castro Creek water from the Magee ditch for domestic purposes. A little later he installed his own pipe-line, taking water directly from this creek, his intake being at a point farther up the stream than the Magee intake. Plaintiff cleared about an acre of land for his house and garden, and another acre which he set out to orange trees, and continued to use this water both for domestic purposes and for irrigation. All of these improvements were made with the knowledge and consent of said Magee, and it is apparent that at that time the relations between the plaintiff Gray and the defendant Hugh Magee were most friendly. On July 20, 1928, defendants Hugh Magee and Florence M. S. Magee, his wife, conveyed to the plaintiff by deed the tract of land which he had been improving, consisting of about twenty-five acres, together with an easement over certain homestead lands of the grantors, for the purpose of repairing and maintaining a pipe-line thereon. Castro Creek runs through plaintiff's land and his whole twenty-five acres are riparian thereto.

This action was begun by the plaintiff for the purpose of establishing his right to take water from Castro Creek, and also for the purpose of enjoining the defendants from interfering with the plaintiff's use of a certain road, which, it is claimed, constituted his only means of access to his property.

In his first cause of action, after alleging his ownership of the property and his improvements thereon, plaintiff alleges that he has used domestic water from Castro Creek for three years and irrigation was for one and one-half

years, and that he needs for these purposes a total of 24,000 gallons of water per day in the irrigation season; that more than thirty years ago the estate of Victoria P. de Magee attempted to appropriate 100 miner's inches of water from Castro Creek, and during that period of time have maintained a diversion ditch, taking said water over the land now belonging to plaintiff to lands belonging to the estate, which are not riparian to the creek; that for the past five years the said estate has not put said water to beneficial use to its full extent, but has at all times during the past ten years left unused and abandoned and wasted water to the extent of more than 24,000 gallons of water per day; that with the consent of the defendants, plaintiff completed in May, 1927, a dam and pipe-line capable of carrying about 24,000 gallons of water per day, and that such water as he does not use is returned to the estate's diversion ditch as it crosses plaintiff's land; that plaintiff has used 24,000 gallons of water per day and is entitled thereto by reason of his riparian rights and his use thereof, and by reason of the nonuse and abandonment of a part of the water of Castro Creek by defendants; and that plaintiff has made application to the state division of water rights for the appropriation of that amount of water. Plaintiff asks that the defendants be enjoined from interfering with his right to take said water, and that title thereto be quieted. In their answers defendants allege that for more than fifty years they have diverted and put to beneficial use all of the waters of Castro Creek, and deny any nonuser or abandonment of any of said water. Cross-complaints were filed in which the defendants asked that they be declared the owners of and entitled to all of the waters of said creek, and that the plaintiff be enjoined from the use of any of said water.

Among other things, the court found the plaintiff's land was wholly riparian to Castro Creek, and that the lands of the defendant estate were not riparian to said stream; that plaintiff acquired title to his property on July 20, 1928, together with the right of ingress and egress over certain property belonging to Hugh Magee and his wife for repairing and maintaining a pipe-line thereon, and to take domestic and irrigation water therefrom; that the plaintiff occupied his land prior to the date of his deed as a licensee

of the grantors therein, and with their consent established, at some time prior to May 4, 1927, his own diversion system, with an intake above that of defendants; and that such water as is not used by the plaintiff is diverted back into the defendants' diversion system. The court also found that the plaintiff has put to beneficial use not less than the amount of water he claimed in his complaint, namely, 24,000 gallons per day; that the defendant estate more than forty years ago appropriated all of the water of Castro Creek, diverting the same at a point on unpatented government land, and for a long time applied all of said water to a beneficial use on the estate land; that for more than five years next before the commencement of this action, the defendants have not put said water to beneficial use to the fullest extent, in that during the past five years they ''have failed at all seasons of each year to devote to any beneficial use one-half of one statutory miner's inch of water out of the quantity that under natural conditions flows in said stream at the estate's intake''; that for more than five years, in addition to the one-half inch of water mentioned, they have at all times between the 1st of November of each year and the 1st of May next following, out of increased flow during that period ''wholly failed and neglected to devote to beneficial use a further quantity'' of ''not less than one statutory miner's inch of water''; and that there was at the time of the commencement of the action an aggregate of not less than one and one-half statutory miner's inches of water between the 1st of November of each year and the 1st of May following, and at all other times of each year there was one-half of a statutory miner's inch of water, which had ceased to have the status of a flow of water appropriated by the defendants. The court further found that in addition to said one-half inch in the summer and one and one-half inches in the winter that had not been put to beneficial use by the defendants during the preceding five years, the plaintiff, by locating his intake farther upstream than the estate intake, had saved further water, not theretofore used, in the amount of one-quarter of a statutory miner's inch between May 1st and November 1st of each year, and had put such saving to beneficial use upon his land. The court also found that in the dry half of each year there is sufficient water in the stream over

and above that put to beneficial use by the Magee Estate, so that plaintiff may take *not to exceed* three-fourths of a statutory miner's inch of water without infringing on any right of the estate; and, further, that "seldom, if ever, even in the driest season of the year, is the flow at plaintiff's intake less than three and one-half statutory miner's inches". As conclusions of law, the court found that the plaintiff was entitled to take three-fourths of a statutory miner's inch, equal to 12,117.60 gallons of water per day, during the period from May 1st to November 1st of each year; to take double that amount during the remainder of each year; and to a decree quieting his title to said amount of water. The conclusion of law then contains the following:

"That plaintiff's right to such water is fixed and determined upon the basis of a flow of said stream at plaintiff's intake at no time less than three and one-half (3.50) miner's inches, and that when, if ever, the flow of the water at that point shall in fact fall below that *quantum* . . . defendants are entitled to have the amount of water used by the plaintiff from his diversion and not returned into defendants' ditch diminished to the same extent that the flow of said stream at the location of plaintiff's intake shall fall below said minimum of three and one-half (3.50) miner's inches"; and, further, that the plaintiff should be required "at his own expense to install and maintain immediately above his intake proper measuring devices, so as to ascertain whether or not at any particular time the minimum flow of three and one-half (3.50) miner's inches is being maintained."

The decree followed these findings and conclusions of law. The plaintiff has appealed, particularly stating, however, that he takes no appeal as to the quantity of water allotted to him. As to the water issue, he asks that the case be not reversed, but that the conclusions of law and the decree of the court be amended to conform to the findings and be limited to the extent of the facts found.

The gist of appellant's contentions in this regard is that the findings of the court amount to a positive finding that respondents have a prior right to 2.75 inches of water and no more; that this prior right of respondents should not be enlarged and appellant, as a riparian owner, is en-

titled to all water that he can put to beneficial use over and above the 2.75 inches to which respondents are found to have priority; and that those provisions found in the conclusions of law and the decree, which provide that when there is less than 3.50 miner's inches of water in the stream the deficiency shall come from that part allotted to the appellant, are contradictory to the findings that the appellant was entitled to three-fourths of an inch in the summer-time, and the respondents to two and three-fourths inches. Appellant argues that the findings that the flow in the summer-time was seldom, if ever, below 3.50 inches, and the appellant is entitled to three-fourths of an inch in the summer-time and respondents to 2.75 inches, but that if the flow falls below 3.50 inches, the reduction is taken from the appellant, amount to a positive finding that respondents have a right to 2.75 inches of water and no more. As we understand it, this entire argument is based upon the supposition that the court had positively found that respondents had a prior right to 2.75 inches of water and no more. We are unable to follow appellant in this contention. The court did not affirmatively find that respondents had a prior right to 2.75 inches only, although appellant attempts to arrive at that conclusion by mathematical computation. Instead of finding as to the quantity of water which the estate had used and to which they had priority, the court approached the problem from the other direction, and after finding that they had theretofore taken all of the water at the point of their intake, the court found that during more than five years, they had so far failed to make a beneficial use of all of this water, that they had lost the right to one-half of one statutory miner's inch during the summer and one and one-half inches during the winter. The amount of water to which appellant could acquire a right was therefore limited to this amount, with the exception of the additional amount which he was able to save by reason of his intake being farther upstream.

Furthermore, the court found that in the dry season of the year, appellant could take "not to exceed three-fourths of one statutory miner's inch of water", without infringing on the rights of the defendant estate. What is here referred to by the words "not to exceed" is explained by another provision wherein it is stated that plaintiff's

right to such water is determined upon the basis of a flow at his intake of not less than 3.50 miner's inches, and that in the event the flow at that point should fall below that amount, the reduced amount should be taken from the appellant's allotment. Both the findings and the so-called conclusions of law are all contained in one document which is headed "Findings of Fact and Conclusions of Law". While the statement just referred to appears under a subheading labeled "Conclusions of Law as to Water", it cannot be doubted that it is more in the nature of a finding of fact than a conclusion of law. It relates to and explains the basis upon which appellant's rights have been determined in the findings, and it explains what was meant by the use of the words "not to exceed" in the finding that the plaintiff could take not to exceed three-fourths of an inch of water, without infringing upon respondents' rights. Nor do we think it can be held to contradict the findings of fact because this provision happens to have been inserted in that part of the instrument which was headed "Conclusions of Law". ▇▇ It is a general rule of law that all of the findings should be read together, and not taken piecemeal. And that reference may be had to the context to ascertain any doubtful meaning. (*Ackley* v. *Bassett*, 68 Cal. App. 270 [228 Pac. 1057]; *J. M. Brown, Inc.*, v. *W. P. Fuller & Co.*, 28 Cal. App. 676 [153 Pac. 960].) ▇▇ If appellant's reasoning that the court had limited respondents' rights to 2.75 inches were adopted, this finding would, on the other hand, contradict the other findings that the defendant estate had for many years made a beneficial use of all of the waters of said Castro Creek which reached the estate's intake, and that they had later lost, through nonuse, the right to only one-half inch in summer and one and one-half inches in winter. The evidence shows that there was a greatly increased flow of water in this creek in the winter season, and that the defendant estate had made use of this increased flow by storing it in a reservoir for use in the dry season. To find that the respondents had a prior right to 2.75 inches only and that any amount in excess thereof could be taken by the plaintiff would not only contradict the other findings of the court, but would be contrary to all of the evidence introduced. We think it sufficiently appears from the findings of fact and the con-

clusions of law that the court found, not that the respondents had a prior right only to 2.75 inches of water, but that through the respondents' partial nonuse and the saving effected by appellant there had become available for his appropriation and use, not to exceed three-fourths of a miner's inch in the summer season, and one and one-half inches in the winter season; that this three-fourths inch in the summer season was determined upon the basis of there being at all times 3.50 inches of water in the stream at appellant's point of intake; and that the amount of water, the right to the use of which the defendant estate had not lost, was such that when the flow in the stream was less than 3.50 inches, the deficiency must be taken from the amount otherwise available to appellant. The decree follows the actual findings of the court and the conclusions of law, and the sufficiency of the evidence to sustain the findings has not been attacked.

The only other point in regard to water urged by appellant, is that, as riparian owner, he is entitled to all of the waters of Castro Creek that he can put to beneficial use, over and above the 2.75 inches to which respondents were found by the court to have priority. As we have seen, the court did not find the respondents were entitled only to a priority of 2.75 inches. The court found that for more than forty years respondents had diverted and used all of the water in the stream except that they had lost the right to and failed to use a specific quantity for the past five years. The respondent estate was entitled to all of the water it had previously used with the exception of the portion as to which its right had been lost. (*Joerger* v. *Pacific Gas & Elec. Co.*, 207 Cal. 8 [276 Pac. 1017].) Under the findings of the court, only that portion of the water theretofore taken by respondents, to which their right had been lost, was available to appellant.

In his second cause of action the plaintiff alleges that his only means of access to his land is by an existing road over the land of his grantors, Hugh Magee and Florence M. S. Magee, and the lands owned by the defendant estate as described in the complaint; that such road was openly and publicly used for more than forty years as a public highway, with the full knowledge, consent and acquiescence of the defendants; that during the last two years he improved

this road at an expense of $200, at the request of and with the consent of defendants Florence M. S. Magee and Hugh Magee, individually, and as executor of the estate; and that during said time he has continuously used the road. He alleges that the defendants have threatened to fence off the road and destroy his only means of access to his property, and asks that they be enjoined from so doing. The defendants deny that the road has been openly and publicly used by the public for forty years, or for any other time; that it has ever been used as a public road; and that it is plaintiff's only means of access to his property. The court found that plaintiff's only access to his land is by an existing road over the land belonging to Hugh Magee, Florence M. S. Magee and the estate of Victoria P. de Magee, deceased; and that this road is substantially in the same location as an old road that formerly ran over a portion of this land to an old house that formerly stood near the center of the land, and an old trail which formerly proceeded from this old house on across the land in question. The court further found that said road was used more than forty years ago as a private driveway by the family, friends and relatives of the party who formerly owned the old house referred to; that said road has then and since been occasionally passed over by others, but had largely been abandoned for many years prior to September, 1926; that it was never at any time dedicated to public use; that it had not at any time been used under claim of right by the public for any period of five years; and that it never was and is not now a public road or highway. The court decreed that said road is not a public road and that the plaintiff was not entitled to the use thereof without permission.

Appellant, in insisting that this portion of the decree be reversed, first urges that these findings are not supported by the evidence. It is neither possible nor necessary to review all of the voluminous evidence upon this question shown by the record. It cannot be questioned that there is some evidence showing the existence of an old road going as far as the old house mentioned in the findings, and that at certain points its location coincided with the road opened up and claimed by the appellant. This evidence consists both of testimony as to physical remains of such a road

at certain points, and testimony as to travel over the same at various times for a number of purposes. There was also evidence of an old trail extending from that point on over the hills to Agua Tibia. This evidence is not only fragmentary, but its value is greatly reduced by the facts abundantly shown by the record that at the time the new road was opened up by the appellant, physical evidence of the old road did not exist for all of the distance; that evidence is lacking that the new road followed the line of the alleged old road, except in spots; and that even those permanent marks in certain spots which are especially relied on by appellant as conclusively showing the existence of an old road, are such as to indicate not only age but long disuse. On the other hand, the record is replete with evidence that the land over which the road is supposed to have gone, was farmed and fenced for years. There is also evidence that any road that ever existed there was not a public road. Also that Hugh Magee had given appellant temporary permission to open up and use the road across his land and the land of the estate, upon his agreement to put in a gate.

Even the appellant testified about what he first found there, as follows:

"The Court: Describe just what you saw.

"A. Yes. The road laid midway between these two low hills and then debouched on to open mesa land. After leaving the olive trees, the road at that time was almost impossible to follow. It could have been anywhere—two years previous to my visit another road had been used by the Magees."

He further testified that when he first went over the location of the road there was brush growing upon it, bee sage and deer weed, but that it could be distinguished from the heavy chaparral growing along the sides. He admitted that when he started work in the road there were pieces of fence over the road, although he did not remember whether there were two or three wires thereon. He testified that he had to move three posts off of the road in order, as he says, to make it more convenient; that these posts did not look like new fence; that he was using the road at the suggestion of Magee and that he had permission to do so; that for a time he maintained a gate on the road and at Hugh Magee's

request kept the same locked; and that both executors of the estate had keys, but no one else except, apparently, himself.

Hugh Magee testified that the fence across this road has been there a good many years; that it was there in 1914 and has been there since; that there was no gate where the claimed road is located, previous to 1927; that in that year he permitted appellant to cut the fence so that he could drive through, and the gate was built to keep the stock from bothering; and that there was no road there from 1913 to the time in 1927 when the appellant fixed one.

Mrs. Florence Magee testified there was no road there when she came there in 1913; that there has been a fence crossing what is now the road, since 1913; that she heard her husband tell appellant in 1927 that he might use this for a road temporarily, and that later, because hunters bothered, her husband told appellant he must maintain a gate and keep it locked. Will Magee testified that there has always been a fence there to separate the agricultural lands from the grazing lands; that he personally saw this fence in 1913 and again in 1923, and that it was there each year thereafter until 1928. Fred Sickler testified that an old road over a portion of the route of the new road had washed out about 1890 and that it had never been repaired or used again, although he had gone over it on horseback while hunting since that time; that from 1890 on a person would never know there had ever been a road there, except that in one place it was evident that there had been one graded down a hillside; and that the fences above referred to had been there a great many years. M. M. Sickler testified there has been no traveled road across this property subsequent to 1914, but that a fence had been built around the property in 1914, which the witness thought was there until 1926. In reference to the supposed road which was testified to by certain witnesses as proceeding from the old house above mentioned on over the hill to Agua Tibia, most of the evidence is to the effect that there had been an old trail there used by the Indians; and while there was some evidence of its occasional use in more recent years, one witness testified that there has never been a traveled or wagon road in that location, and another witness

testified that there had never been a usable wagon road there.

The evidence, taken in the light most favorable to appellant, goes no further than to show there was formerly some sort of road which in some places followed the route of the new road to which he lays claim; that such road as there was, was used mostly by the occupants of the lands and their occasional visitors, with a little evidence of occasional use by others, such as Indians and hunters; and that, except for the road to the old house, there had been no real wagon road over any part of the way. On the other hand, there is positive evidence that there had never been a public road there; that such road as there was had been long unused; that the property over which the road is now claimed had for years been fenced and farmed; and that for the last year or two prior to the trial of this action appellant had been using and improving a road across this property with the permission of Hugh Magee, one of the defendants. At best, nothing more than a conflict in the evidence is here presented and we think there is sufficient evidence to sustain the findings of the trial court that no road over the route now claimed as a road by appellant, had at any time been dedicated to public use, nor has such a road at any time for a period of five years been used under hostile claim of right by the appellant, and that the same never was and is not now a public road or highway. (See *Clarke* v. *Clarke*, 133 Cal. .667 [66 Pac. 10] ; *Thomas* v. *England*, 71 Cal. 456 [12 Pac. 491] ; *People* v. *Rindge*, 174 Cal. 743 [164 Pac. 633].)

The appellant next urges that, if not otherwise, he is still entitled to the use of the road in question under the law of way of necessity. The court found that plaintiff's only access to his land is over the road in question. This does not seem to be supported by the evidence, as the appellant went upon the land in 1924 and built a permanent house in 1925, while he himself testified that the first time he went over the road in question was in September, 1926; and also, that during the earlier years he was there it was his custom to use the longer road around by Hugh Magee's house. Appellant relies upon the rule laid down in *Mesmer* v. *Uharriet*, 174 Cal. 110 [162 Pac. 104, 106], as follows:

"When a grantor conveys land shut off from access to road by the grantor's remaining land, or partly by his land and partly by that of a stranger, the way of necessity arises over the adjoining land of the grantor."

■ Not only does it not sufficiently appear that appellant's land is entirely shut off from access to any road, but it does appear that he is claiming this way of necessity not over lands belonging to his grantor, which adjoin the land conveyed to him, but over the intervening land of the Magee Estate, in which appellant's grantor has only a partial interest as one of the heirs, and then over land owned by his grantor. Such a right does not arise when the only interest of the grantor ·in the adjoining land over which a right of way is claimed is that of a cotenant with other parties interested in the estate, which estate is in the process of administration. (*McDonald* v. *McElroy*, 60 Cal. 484.)

■ Appellant next insists that the respondents should be estopped to deny him the right to use the road in question by reason of their consent and approval of his previous use thereof, and by reason of his improving the road and spending money on the strength of his right to use the same. Not only does the evidence show such consent as was given by respondent Hugh Magee to have been a consent to use of the road temporarily, but the greater part of the road claimed is across the lands belonging to the Magee Estate. Not only is the evidence not sufficient to sustain appellant's contention in this regard, but Hugh Magee, as one of the executors of the estate, was without authority to bind the estate in any such manner. (See *City of Eureka* v. *Fay*, 107 Cal. 166 [40 Pac. 235].)

■ Appellant's final contention is that the court erred in denying his motion for a new trial upon the ground of newly discovered evidence, it being contended that the court is required to review such an order under section 956 of the Code of Civil Procedure. It is sufficient to say we have read the affidavits setting forth the newly discovered evidence, and the most that can be said for them is that they only add to the already existing conflict in the evidence.

For the reasons given the judgment is affirmed.

Marks, Acting P. J., concurred.

Cary, P. J., being absent, took no part in this decision.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 20, 1930, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 24, 1930.